**IN THE UNITED STATES DISTRICT COURT,**

**DISTRICT OF NEW JERSEY**

---

| | | |
|---|---|---|
| Renee Handley, | : | |
| in her individual capacity, | : | |
| *Plaintiff,* | : | |
| v. | : | |
| | : | Case No. 1:21-cv-16889 |
| | : | |
| | : | |
| Rowan University and | : | JURY TRIAL DEMAND |
| Mr. Noah Weinstein in his individual | : | CIVIL ACTION-LAW |
| capacity, | : | |
| *Defendants* | : | |

---

**VERIFIED COMPLAINT**

Plaintiff by and through their undersigned attorneys, brings this Complaint against the above-named Defendants, agents, and successors in office, to safeguard her rights under the United States Constitution, State and Federal law, and in support thereof alleges the following:

**PRELIMINARY STATEMENT**

1.  Ms. Handley (the "Plaintiff" is currently a student in good standing, in her senior year, at Rowan University (the "University" or the "Defendant").

2.  The University is a public university and is believed to be a federal funds recipient.

3.  The University has subjected to Ms. Handley to ongoing and continuous discrimination on the basis of her sex, gender, and disability status.

1

## JURISDICTION AND VENUE

4.   This court has jurisdiction under 28 U.S.C. §1331, as the causes of action contained

herein invoke federal question jurisdiction, as Plaintiffs bring claims arising under federal

law.

5.   This court has supplemental jurisdiction over Ms. Handley's state claims pursuant to 28

U.S.C. § 1367.

6.  Venue for this action properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)

because the events that give rise to the claims in this action occurred in this District.

## PARTIES

### Plaintiffs

7.  Plaintiff Ms. Renee Handley, individually, is an adult residing at 110 Woodfield Ct.,

Cherry Hill, New Jersey 08003.

### Defendants

8.  Defendant Rowan University is a public university and federal funds recipient, believed

to be doing business at, and with its principle offices at 201 Mullica Hill Road,

Glassboro, New Jersey 08028.

9.  Defendant Noah Weinstein is an adult individual who is employed by Rowan University,

and who is believed to be doing business at 201 Mullica Hill Road, Glassboro, New

Jersey 08028.

**FACTUAL ALLEGATIONS**

10. Ms. Handley is a senior at the University, where she has majored in writing arts, with a minor in education and art. Ms. Handley first enrolled at Rowan University in July 2017. Prior to the COVID-19 pandemic, Ms. Handley resided on campus in the student housing dormitories. Based on information and belief, the student housing is owned and operated by the University.

11. Ms. Handley is a student who is diagnosed, *inter alia*, with a learning language disability, dyslexia (specific learning disability in reading), depression, anxiety, ADD, scoliosis, and PTSD. As a result of these disabilities, she is easily overwhelmed and has trouble navigating emotionally-difficult situations. At all times relevant, Plaintiff has informed the University of her disabilities and the way that these disabilities impact her ability to access her education.[1]

12. Starting in the spring of 2018 and continuing thereafter, Mr. Weinstein started to make romantic and sexual advances toward Plaintiff. This included ongoing flirtations with her. For example, Mr. Weinstein would text Plaintiff and tell her "how beautiful" she is. Mr. Weinstein also would tell Plaintiff that she is his "best friend," how he "used to be lonely until he met [her],". Mr. Weinstein would show jealousy and would demand that Plaintiff stop wearing crop tops because "it's not appropriate." Mr. Weinstein's sexual and romantic overtures also included him flirtatiously asking, "why are you wearing that dress?; there's a flower on your boob." When Plaintiff asked him to stop sexually

---

[1] Curisoly, Ms. Handley supplied the University with documentation about her PTSD, only for the University to lose it.

harassing her, he responded, "I can say whatever I want." Sadly, Mr. Weinstein's flirtations continued to disrupt Plaintiff's education throughout the fall semester, 2019.

13. In or around April 2018, Ms. Handley reported concerns about dating violence at Univerty events, which included stalking and rape, to Mr. Weinstein. Mr. Weinstein is the University's disability coordinator. In response to her concerns, Mr. Weinstein stated that if "something happened to [the Plaintiff] at a frat house, it was [her] fault." Here, the *something*, clearly, was rape or sexual assault. During this conversation, Plaintiff spoke to Mr. Weinstein about the student who raped her in high school and her present concerns about her safety at the University regarding this very issue. She asked the University and Mr. Weinstein what she could do to participate in University activities while remaining safe from sexual violence. Mr. Weinsteins' statement showed that he was deliberately indifferent to Plaintiff being victimized by sexual violence.

14. On May 1, 2018, Plaintiff reported to Mr. Weinstein that a male who was stalking Plaintiff had contacted her. Here, Plaintiff was simply reporting the stalking, as she was concerned about her safety. Plaintiff made this report via text message to Mr. Weinstein, which contained a screenshot from Snapshot from a male student who cyberstalked Plaintiff. Mr. Weinstein never followed up with the Plaintiff, never initiated an investigation, never offered her guidance about whom she should contact, and, based on information and belief, did not make any report to anyone at the University. In fact, Mr. Weinstein never even responded to the Plaintiff. Mr. Weinstein's deliberate indifference and refusal to address the situation only put Plaintiff in further danger.

15. During this time, Mr. Weinstein also sent shirtless and inappropriate texts to Plaintiff over Snapchat. Mr. Weinstein not only put Plaintiff in further danger, but also contributed to the harassment.

16. Starting in or around November 2018, a male college student, who attended the University, was granted access to her dormitory where he was able to repeatedly sexually assault and rape Ms. Handley on two occasions. During these encounters, this same male student committed an assault and battery when he slapped Ms. Handley across the face. Subsequently, he continued to stalk Ms. Handley.

17. On or around January 23, 2019, Plaintiff reported that a male student raped her to Mr. Weinstein.[2]  He did not make a report and did not take any steps to help her. Instead, Mr. Weinstein yelled at Plaintiff for getting raped. As a direct result of Mr. Weinstein's forbearance, the rapist stalked Plaintiff for the next two weeks. At all times relevant, Plaintiff reported the stalking to Mr. Weinstein in person.

18.  Around that time, because Mr. Weinstein took no action, Plaintiff reported the rape to supervisory personnel, Mr. John Woodruff. Mr. Woodruff, too, stated that he would "look into [the rape] but" he did not  "believe" the Plaintiff. During this same meeting the Dean said Plaintiff "did not value her spot at Rowan University" and accused her of causing problems by reporting the rapes. The Dean then emailed  her parents. Following the

---

[2] Earlier the day of the first the rape, Plaintiff had already reported the rape to Carrie Brown, a student worker in disability resources.

email, the Dean met with Plaintiff's parents, without her consent. The Dean concluded by telling Plaintiff that he did not believe her about what was reported.

19. Around this time, in early February 2019, Mr. Weinstein finally agreed to walk with Plaintiff to the campus police station. However, before Mr. Weinstein could walk with the Plaintiff to the police station, he started to cry.  Mr. Weinstein then instructed Plaintiff that she should instead bring a friend to the police station because Mr. Weinstein is friends with the man who raped the Plaintiff; that turning his friend into the police made him feel uncomfortable.

20. On February 7th  2019, the University informed Ms. Handley that it would provide her with a Title IX advocate who was charged with taking her report. At that time, however, the University failed to provide her with an advocate, which excluded her from the process, as Ms. Handley has a learning language disability. Subsequently, Christine Pickle, one of the attorneys representing the University, who was working on this same case, offered to be Ms. Handley's advocate. This, obviously, presented a conflict of interest and an unfair process. What is more, the University abruptly terminated the meeting.

21. In February 2019, Ms. Handley met with Mr. Weinestein in the Disability Services office to discuss the sexual violence. Rather than offering guidance to Ms. Handley or making a report, Mr. Weinstein yelled at her. Here, Mr. Weinstein blamed Ms. Handley for getting raped. Moreover, Mr. Weinstein was deliberately indifferent to the fact that a student

raped Plaintiff and that it was clearly interfering with her ability to meaningfully

participate in her education and in campus life. In response to Plaintiff reporting that her

emotional health and ability to participate in her education was suffering, as a result of

the rape, Mr. Weinstein asserted:  "Don't eat, we don't care. Just smile. Correction, we do

care, but just smile; we won't ask."

22. On or around February 21, 2019, Mr. Weinstein again mocked Plaintiff for surviving the

rape. Specifically, he said, "if you come back to me with the same story with the new guy

[you are dating], I will tell you I told you so and it will be your fault." It is apparent that

Mr. Weinstein was *victim-blaming* when Plaintiff simply asked him for help. Here, the

Plaintiff merely asked that the University keep her safe at school from sexual violence.

23. In or around February 2019, the University issued a no-trespass order to the male student

who raped Ms. Handley.

24. Additionally, in the spring 2019 semester, Ms. Handley requested accommodations for

her dyslexia from the University. Staff, however, yelled at Ms. Handley to the point she

cried. Here, in response to Ms. Handley making this request for accommodations, staff

asked, "why are you here?".

25. Around this time, Plaintiff reported to the Disability Office that, because of the rape and

sexual assault,  she was feeling suicidal. The Disability Office refused to help her.

Because of the manifestation of Ms. Handeley's mental illness and suicidal ideation, and

the University's failure to assist her, it denied her access to her program on the basis of

her disabling condition.

26. In fact, in response to Plaintiff's requests for help, Mr.Weinstein stated he was refusing to help her. He added, "I will come back to you when you are done this fucking fit."

27. On or around March 6, 2019, when Plaintiff followed up with Mr. Weinstein about the next steps that he would be taking to ensure Plaintiff's safety and access to the University, he responded, "do you want me to lose my job and everyone knows you are the reason I lost my job?".

28. In or around March 2019, the University Dean also violated Ms. Hadnley's FERPA rights by disclosing the sexual assault to her Parents without her consent. At that time, Ms. Handley was a twenty-year-old adult and did not consent to the sharing of those personal details. By disclosing this information to Ms. Handley's parents, the University further signaled to her that she was not welcome.

29. In April 2019, Mr. Weinstein, on two occasions, called Ms. Handley a "slut." He then told Mr. Handley he "does not help sluts."

30. Though, in February 2019, the University issued a no-trespassing order to the student who raped the Plaintiff, it later lifted the order without the consent and knowledge of the Plaintiff. More specifically, on September 1, 2019, the University lifted the order, which subjected Ms. Handley to further risk throughout the fall 2019 semester.

31. At the beginning of the fall semester, in or around September 2019, the University revoked the no-trespass order it issued against the male student who raped Ms. Handley. Because the University arbitrarily revoked the no-contact order, it further put Ms. Handley at risk for further sexual violence and harm.

32. Subsequently, on October 25, 2019, during the Univeristy's Title IX/ sexual assault
hearing, Univeristy attorney Christine Pickle informed Ms. Handley there was nothing
they could do, as "alcohol doesn't affect consent."

33. Additionally, when Plaintiff brought the rape claim forward, University staff cautioned
her to consider "her position at the University," which she saw as a threat for removal as
club secretary. Here, the University was clearly retaliating against Ms. Handley for using
the Title IX process.

34. Though the School eventually convened a hearing and expelled the student who sexually
assaulted the Plaintiff, it unreasonably delayed the hearing until October 2019. During the
intervening months, the University took little or no reasonable steps to keep the student
away from Ms. Handley. Because it waited so long, he was able to torment Ms. Handley,
forcing her to relive the trauma of the rape.

35. In or around November 2019, the University also forced Ms. Handley to relive the trauma
when Mr. Weinstein sarcastically congratulated her about the expulsion of the student
who raped her. He then yelled at Ms. Handley, "you make everything worse and you
make me feel like I can't do anything right." Again, it should be noted that Mr.
Weinstein, per his own admission to Plaintiff, is friends with the student who raped Ms.
Handley. Here, Ms. Handley believes that Mr. Weinstein's hostile reaction is based on the
fact that Ms. Handley's report resulted in his friend being expelled. As such, Ms. Handley
asserts that Mr. Weinstein and the University retaliated against her for participating in the
Title IX process.

36. In the fall of 2020, a male student again stalked Plaintiff. The University was aware that
this male student had a history of stalking Plaintiff in the past, as she had previously

9

reported it to the University several times. Again, this same student had been stalking Plaintiff since 2017.

37. In September 2020, Ms. Handley reached out to the University's Writting Center about getting academic/504 accommodations for her disabilities, which included a learning language disability; mental-health challenges, resulting from a sexual assault, which interfered with her education; PTSD; and depression. Despite reaching out numerous times in October, the University largely ignored Ms. Handley's entreaties.

38. Because Ms. Handley has several disabilities, including a learning language disability, she had a hard time navigating the University's Title IX process, as well as accessing her education. Here, Ms. Handley made it clear that, because of her disabilities, she had difficulty navigating the Title IX process. The University's deliberate indifference to her disabilities and refusal to accommodate these disabilities denied her a fair process and the ability to fully participate in her education.

39. More specifically, Ms. Handley's disabilities, including her learning language disability, meant that she had a limited ability to understand and navigate the Title IX process. At all times relevant, she made this fact known to the University. However, instead of assisting her and providing meaningful accommodations, the University *barred her at the schoolhouse gates.*

40. On or around October 2, 2020, Ms. Handley reported new incidents of stalking to Mr. John Woodruff. However, Mr. Woodruff informed Ms. Handley there was nothing he could do about the stalking. Instead, Mr. Woodruff responded by telling Plaintiff she should "just transfer." Here, Mr. Woodruff, clearly, was deliberately indifferent to Ms. Handley's requests to remain safe at school.

41. Curiously, the University also informed Plaintiff that this same individual had a history of stalking other women on campus, as well. When Plaintiff reported the stalking to Mr. Weinstein in November 2020, he responded, "I don't understand. I do understand. I just don't care. I don't care about your safety." Here, even though Plaintiff reported the stalking, Mr. Weinstein refused to take any action. As a result, the student continued to stalk Plaintiff through December 2020.

42. On or around October 23, 2020, Dean Kovett showed up, uninvited, at Ms. Handley's campus therapy intake. During this interaction, Dean Kovett informed her that he cannot "be alone with young women because of the allegations they are going to make against" him. Part of this intake was so Ms. Handley could make a report about stalking. Because he showed up unannounced, she was unable to complete the reporting.

43. In October 2020, a student tutor at the writing center communicated with the Title IX office about Ms. Handley's disabilities/disability status. After the Title IX office spoke with the Writing Center about her disability status, the writing center canceled her tutoring sessions for the rest of the semester. As a result, Ms. Handley ended up struggling with her classes, failing a course, and taking incompletes in the remaining classes.

44. In March 2021 Plaintiff retained undersigned counsel to assist her with resolving ongoing issues with the University, which included sex- and gender-based discrimination, campus safety, dating violence at the Univeristy, stalking, and how the University planned to address the rapes perpetuated by the male student. Between March 2021 and July 2021, Plaintiff, through undersigned counsel, shared numerous concerns regarding the same with the University.

45. Sadly, even with undersigned counsel involved, the University has refused to take her concerns seriously. Instead, during June and July 2021, the University engaged in a sham Title IX investigation process, with a predetermined outcome.

46. Between March and June 2021, the University gave Ms. Handley confusing and, often, incoherent guidance on how to file a complaint. When Ms. Handley spoke with University staff, she often encountered conflicting information and was met with hostility. Most of the time, staff told her to transfer to a different school.

47. On or around June 15, 2021, after much confusion, Plaintiff submitted her signed Title IX complaint to the University.

48.  Rather than promptly starting the Title IX investigation, the University decided to *play games*. Here, for example, even though Plaintiff clearly signed the complaint, the University rejected it, falsely claiming that Plaintiff did not provide her signature. The University subsequently sent Ms. Handley a copy of the complaint on University letterhead for her to sign. Quite conspicuously, the University's version of the complaint omitted key portions of Ms. Handley's actual concerns and averments.

49. When undersigned counsel pointed out to the attorney for the University, who is also an employee of the University, that it was omitting key portions of the complaint, the attorney engaged in a campaign of stonewalling and refused to cooperate to make the changes to the complaint. When she finally agreed to cooperate with instructing the University to accurately reflect Plaintiff's concerns, she further delayed the process.

50. On July 9, 2021, Plaintiff resubmitted her complaint to the University. The University finally accepted her complaint.

51. Five days later, on July 14, the University dismissed most of her complaint. The University's findings are a *fait accompli*. The investigators failed to offer any reasons why they dismissed nearly the entire complaint. Instead, the University simply provided boilerplate language that recites the *Davis* elements. At no point did the University apply the law to any of the facts as alleged in Plaintiff's complaint. A mere recitation of law does not, in any way, address the claims Plaintiff raised. Moreover, the University's report did not address any of the specific allegations. It simply dismissed them without explaining why.

52.  The University dismissed much of Plaintiff's Title IX complaint, alleging that Plaintiff failed to show that Mr. Weinstein and the University had engaged in severe, pervasive, and objectively offensive conduct, which denies a person equal access to their education. Curisolsy, the very counts the University dismissed specifically concerned severe, pervasive, and objectively offensive conduct, which, ultimately, denied Plaintiff equal access to her education. For example, the University dismissed Mr. Weinstein telling Plaintiff that it was her fault if a student raped her; where Mr. Weinstein yelled at the plaintiff for the student raping her; where Mr. Weinstein blamed Plaintiff that he could loses his job because she reported the rapes to him; that Mr. Weinstein told Plaintiff he "he didn't care" that a male student was stalking her; and that his conduct had excluded her from her education.

53. Plaintiff timely appealed the University's dismissal on July 21, 2021. However, the University did not find any violations. Again, the University offered the same boilerplate legal quotes in place of an actual factual analysis.

54. The University's unwillingness to take seriously the facts Plaintiff has raised has further excluded her from the program. As a direct result of their refusal to even acknowledge these facts, she is unsafe at school and is excluded from her education. Moreover, the University's failure and deliberate indifference to the factual allegations denied Plaintiff equal access to her education.

55. By treating the Title IX process as a *game*, the University further subjected Plaintiff to invidious treatment based on her sex and gender. Furthermore, it is clear that the University is intentionally attempting to overwhelm and confuse a student whom they know has disabilities, further excluding her from her education.

56. On August 12, 2021, the University contacted Ms. Handley and informed her that Mr. Weinstein was filing a no-contact order against her. Here, it is notable that Ms. Handley has not been in contact with Mr. Weinstein since December of 2020 when she reached out to him about safety concerns. It is further notable that Mr. Weinstein filed this no-contact order immediately following Ms. Handley's Title IX complaint where she reported him for his abusive and sexually-violative conduct. It is, therefore, apparent that both Mr. Weinstein and the University are retaliating against Ms. Handley for simply exercising the internal review of the Title IX process.

57. Subsequently, on August 23, 2021, the University sent Ms. Handley the no-contact directive via email.

58. The University's discrimination and harm, based on Plaintiff's sex, gender, and disability status, is ongoing and continuous. Moreover, as of the date of filing, these harms are still occurring.

59. Due to the University's ongoing discrimination and by excluding Plaintiff from school

based disability status, sex, and gender, Plaintiff has suffered emotional and financial

harm.

**COUNT 1**
**SEX AND GENDER DISCRIMINATION IN VIOLATION OF TITLE IX**
*Ms. Handley v. All Defendants*

60. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

    a. Title IX, provides that "[n]o person . . . shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination

under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681.

    b. Based on information and belief, the University is a federal funds recipient.

    c. At all times relevant, Ms. Handley was a student, who was eligible to attend the

University. Furthermore, at all times relevant, Ms. Handley attended the

University. Specifically, Ms. Handley attended the University from July 2017

until the date of filing. (It is anticipated that she will graduate from the University

in December 2021.)

    d. Ms. Handley is a female student and, as such, was entitled to attend school absent

sex- and gender-based discrimination.

    e. The University discriminated against Ms. Handley, based on her sex and gender,

and was delebiratly indifferent to this discrimination. More specifically:

i. The Defendants University and Mr. Weinstein subjected Ms. Handley to
ongoing, unwelcome sexual harassment, which, to a reasonable person, was so
severe, pervasive, and objectively offensive that it denied Ms. Handley
meaningful, equal educational access. Ms. Handley alleges that the University and
Mr. Weinstein, *inter alia*, told Plaintiff that it was *her fault* if a fellow student
raped her in a University dorm; whenever Plaintiff would discuss the fact that
student raped her, Mr. Weinstein would *yell at* Plaintiff *for getting raped*; when
Mr. Weinstein appeared shirtless on video calls with Plaintiff when she wanted to
discuss with him dating violence and the student who raped her; when Mr.
Weinstein yelled at Plaintiff *for getting raped* by another student; when University
employee Mr. Woodruff told Ms. Handley that he did that believe that she was a
survivor of rape at the hands of a fellow University student; when Plaintiff
complained about being raped to Mr. Weinstein, he responded, "Don't eat, we
don't care. Just smile. Correction, we do care, but just smile; we won't ask.";
When Mr. Weinstein finally escorted Ms. Handley to campus police, only to stop
midway, where he informed her that he could not turn in the rapist, because he
was friends with the rapist; when Mr. Weinsten mocked Ms. Handley for the
student raping her, stating, "if you come back to me with the same story with the
new guy [you are dating], I will tell you I told you so and it will be your fault";
and when he called her a slut on numerous occassions; when Mr. Weinstein, on an

16

ongoing basis, made sexual and romantic overtures at Ms. Handley; when Mr.

Weinstein would flirt with Ms. Handley and tell her "how beautiful" she is; when

he would make sexualized comments about her clothing and appearance; and

when Ms. Handley requested that he stop sexually harassing her, and Mr.

Weinstein responded, "I can say whatever I want." These are just a few of the

examples of the patently offensive and outrageous comments that Ms. Handley

endured from Mr. Weinstein.

f.   The University further violated Ms. Handley's rights under Title IX when it

revoked the no-trespass order it issued against the male student who raped Ms.

Handley. Because the University arbitrarily revoked the no-trespass order, it

further put Ms. Handley at risk for further sexual violence and harm.

g.   When the University failed to protect Ms. Handley from ongoing sexual violence,

dating violence, and stalking, which continued until the fall of 2020.

h.   The University further violated Plaintiff's rights to attend school free from sex-

and gender-based discrimination when it failed to provide Ms. Handley with an

actual Title IX investigation.

i. Between March and June 2021, the University gave Ms. Handley confusing

and, often, incoherent guidance on how to file a complaint. When Ms. Handley

spoke with University staff, she often encountered conflicting information and

was met with hostility.

ii.Instead of providing Ms. Handley with an actual investigation, the University provided Ms. Handley with a sham process. Here, when Ms. Handley submitted her Title IX complaint to the University, on June 15, 2021, the University failed to take the process seriously. Rather than promptly starting the Title IX investigation, the University decided to *play games*. For example, even though Plaintiff clearly signed the complaint, the University rejected it, falsely claiming that Plaintiff did not provide her signature. The University subsequently sent Ms. Handley a copy of the complaint on University letterhead for her to sign. Quite conspicuously, the University's version of the complaint omitted key portions of Ms. Handley's actual concerns. This included the University omitting key portions of Ms. Handley's allegations from the report.

iii. Five days later, on July 14, the University dismissed most of her complaint. The University's findings are a *fait accompli*. The investigators failed to offer any reasons why they dismissed nearly the entire complaint. Instead, the University simply provided boilerplate language that recites the *Davis* elements. At no point did the University apply the law to any of the facts as alleged in Plaintiff's complaint. Moreover, the University's report did not address any of the specific allegations. It simply dismissed them without explaining why.

61. The University's deliberate indifference to the ongoing sex- and gender-based

discrimination has denied J.B. the benefits of her education. As such, the University's

conduct is the direct and proximate cause of Ms. Handley's damages.

62. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the

prayer for relief.

**COUNT 2**
**RETALIATION UNDER TITLE IX**
*Ms. Handley v. All Defendants*

63. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

64. The University and Mr. Weinstein retaliated against Ms. Handley for utilizing the

University's Title IX review process. More specifically:

   a. **Protected Activity:** Plaintiff had engaged in a protected activity when she

   participated in the University's reporting and investigation process wherein she

   reported Mr. Weinstein's ongoing sexual harassment. At the invitation of the

   University, Ms. Handley engaged the University's Title IX investigation process.

   In June 2021, Ms. Handley made a formal complaint, which requested that the

   University investigate Mr. Weinstein's ongoing sexual harassment.

   b. **Adverse Action**: In direct response to Plaintiff's participation in the Title IX

   process, the University and Mr. Weinstein took direct action, which "might have

   dissuaded a reasonable worker from making or supporting a charge of

discrimination" – see *Burlington Northern & Santa Fe Railway Co. v. White,* 548
U.S. 53, 68 (2006). Here, the University threatened Plaintiff that Mr. Weinstein
will be filing a no-contact order against Plaintiff. In fact, Ms. Handley has
indicated that she is now fearful of returning to school in the fall and that she has
severe reservations about continuing with the remaining parts of the Title IX
investigation.

    c.    The University engaged in further adverse action when it issued the no-contact
order on August 23,2021, in direct response to Ms. Handley requesting that the
University investigate Mr. Weinstein's ongoing sexual harassment.

    d. **Causation:** Mr. Weinstein is making this threat in direct response to Ms.
Handley's Title IX investigation. But for Ms. Handley reporting Mr. Weinstein's
ongoing sexual harassment, he would not have threatened the no-contact order
against Plaintiff.  In other words, Ms. Handley's report was the *sine qua non* of
Mr. Weinstein's need to retaliate, by filing a *cross complaint* against her.

65. By threatening Ms. Handley with the no-contact order, in direct response to her making
the report, the University has retaliated against her.

66. The retaliation has chilled Ms. Handley's ability to freely and fairly participate in her
education and the Title IX investigation process.

67. The retaliation is the direct source of Ms. Handley's damages.

68. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## **COUNT 3**
## **42 U.S.C. § 1983-- STATE CREATED DANGER**
*Ms. Handley v. Rowan University*

69. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

70. Plaintiff alleges that the University deprived her of the rights and privileges secured to her by the Fourteenth Amendment by subjecting her to state-created danger.

71. Based on information and belief, the University is a federal funds recipient and is a state actor.

72. Defendants violated Plaintiff's rights through the District's state-created danger when:

    a.  Defendants acted in willful disregard of the safety of Plaintiff by permitting students to subject Plaintiff dating violence, sexual harrasment, stalking, and rape, together with allowing Mr. Weinstein to abuse his position of power and authority.

    b.  There existed a special relationship between the state and the Plaintiff such that Plaintiff was "a foreseeable victim of the defendant's acts," and as a "member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general.

    c.  The state actor used its authority to create an opportunity for harm to occur that would not otherwise have existed.

      d.   The harm ultimately caused was foreseeable and fairly direct.

      e.   As a direct and proximate result of Defendants' conduct, Plaintiff was forced to suffer from the unrelenting dating violence, sexual harrasment, stalking, rape, and abuse of power and authority by Mr. Weinstein.

73. The University subjected Plaintiff to ongoing state-created danger when it failed to protect Plaintiff from stalking, dating violence, and rape; when the University refused to take seriously the allegations Plaintiff brough forward in her Title IX investigation, which further put her at risk of harm; when Mr. Weinstein refused to take Plaintiff to the police because he was friends with the male student who raped the Plaintiff; when Mr. Weinstein refused to assist Plaintiff with her reports of stalking and rape from male students by blaming Plaintiff for being the victim; when Mr. Weinstein made sexual and romantic overtures toward Plaintiff.

74. The University was deliberately indifferent to Plaintiff's safety needs, which included taking steps to keep herself from stalking and rape from other students.

75. The University's conduct is the direct and proximate cause of Plaintiff's harm.

76. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT 4
### Discrimination under the Americans with Disabilities Act--denied the benefits of educational services in a safe environment by reason of disability.
*Ms. Handley v. All Defendants*

77. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

78. Defendants discriminated against, and denied Plaintiff, the benefits to her program, under the Americans with Disabilities Act when:

    a.  Ms. Handley is a qualified individual with a disability, as he has both a record of disability and, more specifically, has been diagnosed with several disabilities. In fact, Ms. Handley, at all times relevant to the instant matter, has informed the University of her disabilities, which include, *inter alia*, a learning language disability, PTSD, anxiety, scoliosis, ADD, depression, and dyslexia.

    b.  Ms. Handley is otherwise qualified to participate in the University and/or her program.

    c.  The University is believed to be a federal funds recipient.

    d.  The University has denied Ms. Handley the benefits of her program and has subjected her to disability based discrimination, which included, *inter alia*, staff yelling at her for having dyslexia until the point she cried; when staff questioned "why [Ms. Handley] was even here," because she has dyslexia; when staff ignored Ms. Handley's request for help addressing the PTSD and Depression for on-campus sexual violence, only for staff to fail to provide meaningful

23

accomodations; when staff failed to accomodate and assist Ms. Handley with

navigating the Title IX process, after she informed the staff that, because of her

learning language disability, she was having a difficult time understanding and

navigating the process; and when the writing center canceled her tutoring sessions

in response to learning about Ms. Handley's disability status.

e.   The denial of services and discrimination resulted from the Defendant's deliberate

indifference and refusal to accomdate and grant Ms. Handley access to the

program. This has included Ms. Handley being exited from several classes.

79. The University showed its contempt for Ms. Handley and her disability when they denied

her access to the School and to the program, therefore, *barring her at the schoolhouse*

*gate.*

80. As a direct and proximate result of Defendants' deliberate indifference and intentional

discrimination, the Defendants denied Ms. Handley the benefits of her program.

81. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the

prayer for relief.

<u>**Count 4**</u>
**Discrimination under § 504 Rehabilitation Act**
*Ms. Handley v. All Defendants*

82. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

83. Defendants discriminated against, and denied Plaintiff, the benefits to her program, under the Rehabilitation Act of 1973 when:

    a.  Ms. Handley is a qualified individual with a disability, as he has both a record of disability and, more specifically, has been diagnosed with several disabilities. In fact, Ms. Handley, at all times relevant to the instant matter, has informed the University of her disabilities, which include, *inter alia*, a learning language disability, PTSD, anxiety, scoliosis, ADD, depression, and dyslexia.

    b.  Ms. Handley is otherwise qualified to participate in the University and/or her program.

    c.  The University is believed to be a federal funds recipient.

    d.  The University has denied Ms. Handley the benefits of her program and has subjected her to disability based discrimination, which included, *inter alia*, staff yelling at her for having dyslexia until the point she cried; when staff questioned "why [Ms. Handley] was even here," because she has dyslexia; when staff ignored Ms. Handley's request for help addressing the PTSD for on-campus sexual violence, only for staff to fail to provide meaningful accomodations; when staff failed to accomodate and assist Ms. Handley with navigating the Title IX process, after she informed the staff that, because of her learning language disability, she was having a difficult time understanding and navigating the

process; and when the writing center canceled her tutoring sessions in response to

learning about Ms. Handley's disability status.

    e.   The denial of services and discrimination resulted from the Defendant's deliberate

indifference and refusal to accomdate and grant Ms. Handley access to the

program.

84. The University showed its contempt for Ms. Handley and her disability when they denied

her access to the School and to the program, therefore, *barring her at the schoolhouse*

*gate.*

85. As a direct and proximate result of Defendants' deliberate indifference and intentional

discrimination, the Defendants denied Ms. Handley the benefits of her program.

86. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the

prayer for relief.

**<u>Count 5</u>**
**NEW JERSEY LAW AGAINST DISCRIMINATION**
*Ms. Handley v. All Defendants*

87. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

88. Defendants denied Plaintiffs the benefits to her program under the New Jersey Law

Against Discrimination ("NJLAD") when:

    a.   The NJLAD prohibits discrimination and harassment on the basis of gender, sex,

and disabilty status. <u>N.J. Stat. Ann.</u> § 10:1-2.

b.  NJLAD applies to colleges and universities in the State of New Jersey.

c.  Plaintiff is entitled to attend school at the University.

d.  The University abridged Plaintiff's rights under NJLAD when it failed to protect her from ongoing sexual harassment by its staff, which included Mr. Weinstein; when it failed to properly address the dating violence, rapes, and stalking; when it failed to take seriously her factual reporting of the dating and gender-motivated violence, rape, sexual assault, and stalking; when it failed to safeguard her from the dating and gender-motivated violence, rape, sexual assaults, and stalking.

e.  The University further abridged Plaintiff's rights under NJLAD when it failed to accommodate her disabilities.

89. As a direct and proximate result of Defendants' deliberate indifference and intentional discrimination, the Defendants denied Plaintiff. the benefits of her program.

90. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the prayer for relief.

**Count 6**
**EMOTIONAL DISTRESS**
*Ms. Handley v. All Defendants*

91. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

92. The University and Mr. Weinstein committed the tort of intentional infliction of

emotional distress:

    a.  The Defendants acted intentionally and recklessly.

    b.  The Defendants' conduct was extreme and outrageous, exceeding the bounds of

       decency and, thus, utterly intolerable in civilized society.

    c.  The University, specifically, subjected Plaintiff to emotional harm by treating her

       reports of dating and gender-motivated violence, stalking, and rape as a joke.

    d.  Mr. Weinstein committed the tort of intentional infliction of emotional distress

       when, *inter alia*, he told Plaintiff that it was *her fault* if a fellow student raped her

       at a University dorm; whenever Plaintiff would discuss the fact that student raped

       her, Mr. Weinstein would *yell at* Plaintiff *for getting raped*; when Mr. Weinstein

       appeared shirtless on video calls with Plaintiff when she wanted to discuss with

       him dating violence and the student who raped her; when Mr. Weinstein yelled at

       Plaintiff *for getting raped* by another student; when University employee Mr.

       Woodruff told Ms. Handley that he did that believe that she was a survivor of rape

       at the hands of a fellow University student; When Plaintiff complained about

being raped to Mr. Weinstein, he responded, "Don't eat, we don't care. Just smile. Correction, we do care, but just smile; we won't ask."; When Mr. Weinstein finally escorted Ms. Handley to campus police, only to stop midway, where he informed her that he could not turn in the rapist, because he was friends with them; when Mr. Weinsten mocked Ms. Handley for the student raping her, stating, "if you come back to me with the same story with the new guy [you are dating], I will tell you I told you so and it will be your fault"; and when he called her a slut on numerous occassions. These are just a few of the examples of the patently offensive and outrageous comments that Ms. Handley endured from Mr. Weinstein.

e.   The emotional distress Plaintiff suffered is so severe that no reasonable person could be expected to endure such distress.

f.   Plaintiff has suffered damages as a result of the University's and Mr. Weinstein's conduct.

93. Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## Count 7
### NEGLIGENT HIRING, RETENTION, AND TRAINING OF STAFF, AND FAILURE TO TRAIN
*Ms. Handley v. Rowan University*

94. Ms. Handley hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

95. Defendant owed a duty of care to protect students, including Plaintiff, against the imposition of harm.

96. Defendant had a duty to exercise ordinary care when hiring, training, and supervising their faculty, staff, program directors, and other persons in the employ of the University.

97. The Defendant had an obligation to train its faculty, staff, program directors, and other persons in the employ of the University, including Mr. Weinstein.

98. Defendants knew or should have known that it was important to screen and only hire faculty, staff, who are qualified to supervise and safeguard students from the type of harm caused by Mr. Weinstein. This included screening and training staff to abstain from *hitting on* students, calling them "sluts"; appearing shirtless in video meetings where the student reports that she was raped or in distress\emotional crisis due to trauma; yelling at and blaming survivors of sexual violence; and by giving the Plaintiff  his personal phone number and connecting on social media to gain access to sexually harass the Plaintiff.

99. The Defendant's lack of oversight, failure to properly train, failure to supervise, and failure to monitor its faculty, staff, contractors, and their failure to protect vulnerable students, is a direct and proximate cause of Plaintiff's damages.

100.    Wherefore, Ms. Handley prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## **DAMAGES**

101.    Plaintiffs suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of all Defendants, in an amount that shall be proven at the time of trial. These damages include, but are not limited to:

damages for general pain and suffering; damages for the loss of enjoyment of life, both past and future; medical and medical-related expenses, both past and future; travel and travel-related expenses, both past and future; emotional distress, both past and future; pharmaceutical expenses, both past and future; and any and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Handley respectfully prays that the court award her compensatory and restitutionary damages against Defendants Rowan University and Mr. Weinstein for, including, but not limited to, psychological treatment, lost wages, loss of future earnings, loss of enjoyment of life, emotional pain and suffering, interference with her civil rights, and reasonable attorneys' fees and costs of suit. Furthermore, Ms. Handley seeks any and all equitable relief, together with any and all remedies, that the Court deems just and appropriate.

## DEMAND FOR A JURY TRIAL

In accordance with New Jersey law, Ms. Renee Handley hereby demands a trial by jury on all appropriate issues.

Respectfully submitted,


**MONTGOMERY LAW, LLC**
1420 Locust Street, Suite 420
Philadelphia, PA 19102
***Attorneys for Plaintiffs***


Dated: September 14, 2021                    By: _____

                                             Bradley R. Flynn
                                             NJ Bar ID No. 173362016